NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0170n.06
Filed: March 3, 2006

No. 05-5134

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

STEVE SCIPIO and PATRICK )
PATTERSON, individually and d/b/a )
Cymande Music; LEOSONG COPYRIGHT )
SERVICE, LTD., a United Kingdom limited )
stock company )
)
    Plaintiffs-Appellants, )
)
v. ) ON APPEAL FROM THE UNITED
) STATES DISTRICT COURT FOR THE
SONY MUSIC ENTERTAINMENT, INC., et ) MIDDLE DISTRICT OF TENNESSEE
al. )
)
    Defendants-Appellees. )

Before: CLAY and COOK, Circuit Judges; RICE, District Judge.[*]

COOK, Circuit Judge. Plaintiffs, 1970s musicians, allege that a contemporary music group

unlawfully "sampled" one of their songs in a 1996 release. Prior to Plaintiffs filing a complaint, the

parties negotiated but never executed a settlement agreement (the "1998 Proposed Agreement" or

the "Proposed Agreement"). When those negotiations broke down, Plaintiffs filed this action. After

five years of litigation, continued settlement discussions, and negotiations under the guidance of a

court-appointed mediator, Defendants eventually moved for summary judgment, alleging that

Plaintiffs through their conduct had ratified the Proposed Agreement. The district court granted

_____

[*]The Honorable Walter Herbert Rice, United States District Judge for the Southern District
of Ohio, sitting by designation.

No. 05-5134
*Steve Scipio and Patrick Patterson d/b/a Cymande Music; Leosong Copyright Service, Ltd. v. Sony Music Entertainment, Inc. et al.*

Defendants' motion, holding that Plaintiffs did ratify the pre-litigation agreement, that such agreement constituted an accord and satisfaction, and that, in addition, Plaintiffs should be equitably estopped from further pursuing their claims. This appeal followed. We determine that the Proposed Agreement was never ratified and that Plaintiffs should not be equitably estopped from pursuing their infringement claims. Accordingly we reverse the district court's grant of summary judgment to Defendants.

## I. Factual and Procedural Background[1]

### A. Negotiations Concerning the Proposed Agreement

---

[1]Defendants filed two motions for summary judgment in this matter. The district court denied the first because it relied on inadmissible evidence gathered from the settlement negotiations. Defendants filed a renewed motion, relying only on admissible evidence, which the district court granted. Plaintiffs filed a brief in opposition to the first motion, but failed to respond to the second, even after they were granted five extensions by the district court. Accordingly, in its memorandum and order granting summary judgment, the district court followed local court rules and adopted the Defendants' Statement of Undisputed Material Facts in Support of Their Renewed Motion for Summary Judgment. Middle District of Tennessee Local Rule 8(b)(7)(g) reads:

> Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these Rules shall indicate that the asserted facts are not disputed for purposes of summary judgment.

We find no error in the district court's application of this rule and adopt, as that court did, the Defendants' Statement of Undisputed Material Facts in Support of Their Renewed Motion for Summary Judgment.

No. 05-5134
*Steve Scipio and Patrick Patterson d/b/a Cymande Music; Leosong Copyright Service, Ltd. v. Sony Music Entertainment, Inc. et al.*

Plaintiffs (alternatively, the "Scipio Plaintiffs") are Steve Scipio and Patrick Patterson, members of the early 1970s British funk group Cymande; Cymande Music, a joint venture entered into by Scipio and Patterson; and Leosong Copyright Service ("Leosong"), the administrator of Cymande Music. Around 1972, Cymande released a musical composition entitled "Dove;"[2] Plaintiff Leosong is the administrator and licensor of all rights in "Dove" outside the United States; and Copyright Management, Inc. ("CMI"), a non-party, was (for the relevant periods) the administrator and licensor of all rights in "Dove" in the United States. Defendants (alternatively, the "Fugee Defendants") include the members of the contemporary music group The Fugees, Sony Music Entertainment, Inc., ("SMEI"), and various other music publishers. The complaint alleges that The Fugees infringed the Scipio Plaintiffs' copyrights[3] in "Dove" by sampling without authorization sections of the song in the title track of The Fugees' 1996 album, *The Score*.[4] The plaintiffs also alleged fraud, unfair competition, and "reverse passing off" in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

---

[2]To hear "Dove," go to http://www.cymande.co.uk/music/music.htm (click on "Cymande 1972," and then song six, "Dove").

[3]Defendants point out that the Plaintiffs' ownership of the "Dove" copyright has been asserted, but never proven. Though perhaps true, that issue concerns the merits of Plaintiffs' infringement claims, which we do not reach.

[4]For an excerpt, go to http://www.artistdirect.com/nad/store/artist/album/0,,226252,00.html (scroll down to song nine).

In 1997 and 1998, the parties conducted extensive negotiations culminating in the Proposed Agreement, under which the parties would have jointly owned the rights to "The Score": Plaintiffs receiving 75% of the song's royalties, and Defendants 25%. The negotiations broke down, in part because Plaintiffs alleged that the Fugee Defendants failed to disclose to them during negotiations that "The Score" contains a second unauthorized sample—one from artist Dennis Coffey's "Scorpio." (The Proposed Agreement required SMEI to warrant that "The Score" "[did] not infringe upon the rights of any other party.") In addition, Defendants failed to respond to Plaintiffs' demands for a worldwide accounting of profits obtained from the release of *The Score*. The Proposed Agreement was never executed.

**B. Defendants' and Plaintiffs' Conduct Immediately Following the 1998 Negotiations**

*Defendants' Conduct*. In April 1998, for reasons that remain unclear given the parties' failure to reach an agreement, SMEI began forwarding to CMI—Plaintiffs' agent and the administrator of "Dove" in the United States—payments derived from domestic exploitation of "The Score." In addition, immediately following the negotiations, Defendants gave notice to the foreign collection societies to reduce their claim to foreign royalties of "The Score" from 100% to 25%. This enabled Plaintiffs to collect the remaining 75% of "The Score's" foreign royalties without conflict, since, according to deposition testimony, when there are conflicting claims to a work, foreign collection societies will retain the disputed funds in escrow.

*Plaintiffs' Conduct with respect to Domestic Royalties.*  In April 1998, CMI opened an escrow account on behalf of Plaintiffs at the Music Row branch of Nationsbank (later, Bank of America) to maintain the domestic royalty payments it was receiving from Defendants pursuant to the Proposed Agreement (the "Nations Escrow").  Defendants' payments were deposited in the account, beginning with a check in the amount of approximately $400,000.  The Nations Escrow was in CMI's name, and Terry Smith (Plaintiffs' primary agent at CMI) and James Zwickel (Plaintiffs' counsel) were the sole authorized signatories of the account.  Any withdrawals from the Nations Escrow required the authorization of both Smith and Zwickel.  Defendants lacked any control over the account.

*Plaintiffs' Conduct with respect to Foreign Royalties.*  In March 1998, Plaintiff Leosong registered a claim with the foreign collection societies for 75% of the royalties from foreign exploitation of "The Score."  Also in March, Defendants reduced their claim on the foreign royalties to 25%.  By September, when a third party withdrew its claim for the royalties, Leosong's claim to the 75% was the only other claim.  Plaintiffs have thus far collected over £134,000 in foreign royalties.

### C. Plaintiffs' Posture in the Complaint

The Scipio Plaintiffs filed this action in February 1999.  The complaint acknowledged that in connection with the pre-litigation negotiations Defendant SMEI, on behalf of all defendants, had

already paid approximately $400,000 into the Nations Escrow. SMEI had attached to the payment a statement that the check represented a payment for all units sold, equal to 100% of the mechanical royalties due by SMEI at the maximum compulsory rate; however, according to the complaint, the amount was based only upon a "partial accounting"—of units sold within the United States—rather than the full accounting of worldwide sales that Plaintiffs allegedly had requested.

Importantly, paragraph 69 of the complaint noted that neither SMEI nor Plaintiffs "[were] entitled to distribute [the Nations Escrow] funds unless and until there exists an executed agreement in writing establishing the rights of the respective parties to the profits of 'The Score.'" The same paragraph also noted that the parties had negotiated the Proposed Agreement, but that such agreement provided that it would not be effective until executed by all parties to it.

The complaint represented that all funds theretofore paid by SMEI to CMI—*i.e.*, all funds in the Nations Escrow—would be tendered to the court. None were.

**D. Status of the Domestic Royalties**

In May 1999, Terry Smith, Leosong's agent at CMI, sought and was granted permission from Leosong to remove the funds from the Nations Escrow and to transfer them into an account in the name of "Copyright Management International." Smith's fax to Leosong requesting permission for the transfer displayed a "Copyright Management International" letterhead, and listed Smith as the company's chairman. The purported rationale for the transfer was that the balance of the account

had exceeded the amount the FDIC would insure in a conventional account. Copyright Management *International*, as opposed to CMI (Copyright Management, *Incorporated*), has never been the administrator of Cymande's catalog in the United States.[5]

In fact, the funds from the Nations Escrow were deposited in a Salomon Smith Barney account at Chase Manhattan Bank in the name of Trigon Corporation, a stranger to the current litigation with no claim to proceeds from the exploitation of "The Score."[6] By the middle of 2002, Trigon had changed its name to Copyright.net, and the funds that were originally in the Nations Escrow had migrated from the Smith Barney account to an account at US Bank. There they were used to secure a loan by US Bank to either CMI or Trigon (by then "Copyright.net"). In early 2003, US Bank foreclosed on the loan and seized the funds securing it.

### E. Status of the Foreign Royalties

---

[5]Terry Smith's deposition of September 8, 2004, offers more detail on Copyright Management International, LLC: Sometime in late 1998 or 1999, CMI transferred its assets to Copyright Management International LLC; in return it received a 50 percent interest in the LLC and a commitment from Zeal Entertainment, the other 50 percent holder, to assume responsibility for the LLC's day-to-day operations and to provide additional funding. Smith acknowledged, however, that the Nations Escrow was never transferred to Copyright Management International LLC, and thus that his instruction that the account "remain" in Copyright Management International LLC's name was in error.

[6]In his deposition, notwithstanding the fact that his signature was required for the funds to be removed from the Nations Escrow, Smith disclaimed any knowledge of how the funds were transferred from CMI to Trigon's Smith Barney account at Chase.

Leosong placed the foreign royalties payments it received on Cymande's behalf in an operating account. Brian Scholfield, the CEO of Music Copyright Solutions (which acquired Leosong in January 2002) testified that the funds were accounted for as a "suspense account," *i.e.*, an unallocated liability in Leosong's financial records, rather than a separate bank account with designated dollars.

### F. Litigation History

Plaintiffs commenced suit on February 16, 1999. The parties continued negotiations and eventually retained a mediator and scheduled mediation for December 2002. Defendants failed to attend the mediation and Plaintiffs moved for sanctions. Defendants' response included an affidavit of Jay Bowen, Defendants' attorney, setting forth reasons why the settlement had not been concluded and indicating his belief that a settlement could be effected if more time were granted.

On January 24, 2003, the parties notified the district court that a settlement had been reached. The settlement was never approved, however, as Defendant SMEI was given leave to discuss the details of the settlement with its insurance company. Plaintiffs moved for a status conference in September 2003, and Defendants responded, attaching a second declaration of Jay Bowen. In that affidavit, Bowen stated that he never reached a final agreement with Plaintiffs' counsel James Zwickel, and that as late as February 2003 he had received a draft of an agreement containing numerous material terms never before discussed. Many of those terms, however, had been left

*unmarked* in an otherwise marked-up version of the 1998 Proposed Agreement. Even the 75/25 ownership split detailed in the Proposed Agreement was marked "not discussed or agreed" in the attachment to Bowen's second declaration.

*Defendants' (First) Motion for Summary Judgment.* In late 2003, Defendants learned that the funds they had paid to CMI were no longer being held in the Nations Escrow. In January 2004, they filed a motion to strike the complaint, a motion for summary judgment, and a motion for leave to amend their answer (to add the affirmative defense of accord and satisfaction). The motion for summary judgment is the only one relevant here. Defendants contended that in 1998 the parties "entered into a settlement," that Defendants met their obligations under the settlement by "recognizing Plaintiffs' 75% ownership interest in The Score and paying Plaintiffs their appropriate share of the funds derived from exploitation of that work" (J.A. 231), and that Plaintiffs "ratified the 1998 Settlement by accepting several hundred thousand dollars of Defendants' payments . . . and by seeking money under the terms of the 1998 Settlement from Defendants' foreign representatives." (J.A. 232.) Defendants supported the motion with a statement of facts and a third declaration by Jay Bowen. In contrast to Defendants' posture in September 2003, the statement of facts and the memorandum supporting Defendants' motion stated that the parties "agreed" to the material terms of the 1998 Proposed Agreement. Jay Bowen's third declaration simply stated that the parties "began negotiating a settlement" and that the terms of that agreement "were memorialized in an

unsigned document entitled 'Settlement/Co-Administration Agreement.'" This same document would later be attached to the renewed motion for summary judgment as the Proposed Agreement.

In the January 2004 motion, Defendants first put forth the arguments for accord and satisfaction and equitable estoppel that are relevant to this appeal. They asserted that the parties either ratified the Proposed Agreement, or that equity demanded that Plaintiffs be estopped from otherwise pursuing their claims.

According to Defendants, the Proposed Agreement was ratified by Defendants' performance of their obligations under the agreement and Plaintiffs' acceptance of that performance. Defendants performed their obligations, they asserted, by paying the over $400,000 due under the agreement with respect to the domestic exploitation of "The Score" and by reducing their claims to the foreign royalties—actions they would not have undertaken but for the existence of Proposed Agreement. And Plaintiffs accepted that performance, ratifying the Proposed Agreement, when they made claims upon the foreign royalties and when they "allow[ed]" "[parties] associated with Plaintiffs to withdr[aw] a large portion of the escrowed funds." (J.A. 255.)

The Defendants alternatively argued that Plaintiffs should be equitably estopped from asserting the invalidity of the Proposed Agreement. Defendants claimed that they had "*expected* that the 1998 Settlement . . . resolved Plaintiffs' claims" (J.A. 257) (emphasis added), that but for the

agreement they would not have performed as they did, and thus that it would be inequitable to allow Plaintiffs to accept the benefits of the agreement and yet continue to pursue their claims.

The district court denied Defendants' motion for summary judgment. The court found many of Defendants' factual allegations inadmissible because they were based upon information Bowen had received from Plaintiffs' attorney James Zweikel in the course of mediation and settlement negotiations and were not "otherwise discoverable." *See* FED. R. EVID. 408. The court thereby excluded Defendants' allegations pertaining to the disappearance of the Nations Escrow funds and to Plaintiffs' affirmative steps to collect the royalties from "The Score's" foreign exploitation.

The court went further, however, to say that summary judgment would still be inappropriate even if the statements in Bowen's third declaration were admissible. It held that "a genuine issue of material fact exists as to whether plaintiffs have entered into an accord and satisfaction regarding their claims, particularly considering the fact-specific nature of the inquiry into the parties' intent that is at the center of an accord and satisfaction defense." (J.A. 717.) For similar reasons, it held that summary judgment on estoppel grounds was also inappropriate.

*Defendants' Renewed Motion for Summary Judgment.* In June 2004, Defendants filed a renewed motion for summary judgment, supported not by Jay Bowen's declaration, but instead by the testimony of Plaintiff Steve Scipio and Brian Scholfield, the corporate representative of Plaintiff Leosong. Defendants also filed a memorandum of law and a statement of undisputed facts.

Plaintiffs, despite being granted five motions to extend their deadline, failed to respond.[7]

Accordingly, in its memorandum and order granting Defendants' renewed motion for summary

judgment, the district court adopted the entire statement of facts supporting Defendants' renewed

motion.[8]  This eliminated several points of contention.  Most importantly, the statement of facts

represented that "[a]s a result of negotiations, the parties agreed to the material terms of the 1998

Settlement."  Plaintiffs previously contended that the parties never agreed on the material terms of

the Proposed Agreement.

Defendants' renewed motion for summary judgment and accompanying memorandum of law

subtly departed from their previous motion for summary judgment.  First, Defendants retreated from

their position that they "met their contractual obligations under the 1998 Settlement . . . ."  In the

renewed motion, they maintained that they had performed—though perhaps not *fully*

performed—under the Proposed Agreement.  Second, they emphasized a new argument as to how

Plaintiffs acted intentionally to ratify the Proposed Agreement:  In paragraph 69 of the complaint,

Plaintiffs asserted that neither Defendants nor Plaintiffs "[were] entitled to distribute [such] funds

unless and until there exists an executed agreement in writing establishing the rights of the

[7]The purported reason for Plaintiffs' delay was (after the death of Plaintiffs' counsel's mother in August) to enable Plaintiffs' counsel to obtain the transcript of Terry Smith's September 8, 2004 deposition in a related case, Case No. 3:04–0368. Plaintiffs' original deadline to respond to Defendants' June 8, 2004 renewed motion for summary judgment was September 1, 2004. Smith, who was Plaintiffs' agent and who assisted Plaintiffs' counsel in the related case, was available for Plaintiffs to interview at any time following the June 8 motion.

[8]*See supra* note 1.

respective parties." (J.A. 56.) Defendants contended in their renewed motion that by allowing the funds to be removed from the Nations Escrow, they ratified the Proposed Agreement *thereby*.

*District Court's Grant of Summary Judgment.* In a terse opinion, the district court granted Defendants' renewed motion for summary judgment. It "adopt[ed] by reference as if repeated" its Memorandum in response to the earlier motion, and, as noted, because of Plaintiffs' default it accepted Defendants' statement of facts. Puzzlingly, however, it stated that "[h]ad [the previous motion for summary judgment] been supported by admissible evidence, it would have been granted." (J.A. 1149.) This contradicted its statement in the previous memorandum that it "could not . . . find [that an accord and satisfaction existed] based only upon the vague statements contained in Mr. Bowen's declaration, even if they were not otherwise barred." (J.A. 717.)

*Plaintiffs' Motion to Amend and District Court's Denial of that Motion.* On November 3, 2004, Plaintiffs filed a Rule 59 motion for a new trial, or to alter or amend the district court's October 20, 2004 judgment. *See* FED. R. CIV. P. 59(a), 59(e). On December 1, 2004, the court denied this motion, which it noted could only be granted "if there [were] a clear error of law, newly discovered evidence, an intervening change in controlling law, or to prevent manifest injustice." (J.A. 1567.) The only plausible argument in Plaintiffs' motion was that Terry Smith's deposition, the transcript of which was not available until late September, constituted new evidence. But, the court held, Smith was available to Plaintiffs long before *Defendants* had taken that deposition, and

No. 05-5134
*Steve Scipio and Patrick Patterson d/b/a Cymande Music; Leosong Copyright Service, Ltd. v. Sony Music Entertainment, Inc. et al.*

Plaintiffs "could have deposed him themselves or secured his affidavit testimony in a timely fashion so as to submit it for the court's consideration." (J.A. 1568.)

The Scipio Plaintiffs now appeal the district court's grant of summary judgment to Defendants and its subsequent denial of their motion to alter or amend that judgment.

## IV. Analysis

### A. Standard of Review

We review the district court's grant of summary judgment de novo. *United Rentals (N. Am.), Inc. v. Keizer*, 355 F.3d 399, 405 (6th Cir. 2004). And while we generally review a denial of a Rule 59(e) motion to alter or amend a judgment for abuse of discretion, to the extent the motion seeks reconsideration of a grant of summary judgment, we review de novo the denial of the motion. *Columbia Gas Transmission, Corp. v. Limited Corp.*, 951 F.2d 110, 112 (6th Cir. 1991). Summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

Plaintiffs' failure to respond to Defendants' renewed motion for summary judgment does not itself doom their complaint. According to Federal Rule of Civil Procedure 56(e):

- 14 -

> When a motion for summary judgment is made and supported as provided in this
> rule, an adverse party may not rest upon the mere allegations or denials of the
> adverse party's pleading, but the adverse party's response, by affidavits or as
> otherwise provided in this rule, must set forth specific facts showing that there is a
> genuine issue for trial. *If the adverse party does not so respond, summary judgment,
> if appropriate, shall be entered against the adverse party.*

(emphasis added).  The Supreme Court has expressly rejected the notion that Rule 56(e) alters the

standard stated in Rule 56(c) for granting summary judgment.  Rather, "[a] party is never required

to respond to a motion for summary judgment in order to prevail since the burden of establishing

the nonexistence of a material factual dispute always rests with the movant." *Smith v. Hudson*, 600

F.2d 60, 64 (6th Cir. 1979) (citing *Adickes v. Kress & Co.*, 398 U.S. 144, 159 (1970)).  *See* FED. R.

CIV. P. 56(e) advisory committee's notes to 1963 Amendments (noting that Rule 56(e) only calls for

summary judgment when "appropriate").  And, more pertinent to the situation here, the non-

movant's failure to respond does not free the movant of the burden of establishing that "the moving

party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).

The application of Middle District of Tennessee Local Rule 8(b)(7)(g) to this case means that

there is no dispute as to the facts supporting Defendants' renewed motion for summary judgment.

That still leaves us to examine whether, on the basis of those facts, the district court correctly

granted Defendants' motion for summary judgment and denied Plaintiffs' motion to alter or amend.

We review those decisions de novo, on the basis of Tennessee law.

### B.  Accord and Satisfaction

No. 05-5134
*Steve Scipio and Patrick Patterson d/b/a Cymande Music; Leosong Copyright Service, Ltd. v. Sony Music Entertainment, Inc. et al.*

1. Legal Definitions and Burdens

Sections IV, VI, and VII of Plaintiffs' brief challenge the district court's conclusion that the parties ratified the Proposed Agreement and that the agreement constituted and accord an satisfaction under Tennessee law.

According to Tennessee's long-standing definition of an accord and satisfaction:

> An accord is an agreement whereby one of the parties undertakes to give or perform, and the other to accept in satisfaction of a claim, liquidated or in dispute, and arising either from contract or from tort, something other than or different from what he is or considers himself entitled to; and a satisfaction is the execution of such agreement.

*Lytle v. Clopton*, 149 Tenn. 655, 663 (Tenn. 1923) (quotation omitted).  In other words,

> [T]he *accord* of "accord and satisfaction" is a form of contract.  The satisfaction of a disputed debt (or of an undisputed yet unliquidated debt) is offered in consideration for the substitute performance.

*Ward v. Wilkinson*, No. 01-A-01-9803-CH-00151, 1999 Tenn. App. LEXIS 250, at *4 (Tenn. Ct. App. Apr. 19, 1999).  The party asserting the defense of accord and satisfaction must prove by a preponderance of the evidence both that a contract existed *and* that "the contracting plaintiff agreed to accept lesser payment rendered in satisfaction of the original performance or payment for which the parties contracted."  *Id.* at *4-5 (emphasis omitted).

In the latter inquiry, "[w]hether a later agreement between contracting parties represents an

accord and satisfaction so as to extinguish their original relationship or whether it is simply an

executory accord is a matter of the intention of the parties." *Rhea v. Marko Constr. Co.*, 652 S.W.2d

332, 334 (Tenn. 1983) (citing Restatement (Second) of Contracts § 281, cmt. e (1981)). More

precisely:

> To constitute a valid accord and satisfaction it is also essential [1] that what is given
> or agreed to be performed shall be offered as a satisfaction and extinction of the
> original demand; [2] that the debtor shall intend it as a satisfaction of such
> obligation, and [3] that such intention shall be made known to the creditor in some
> unmistakable manner. It is equally essential [4] that the creditor shall have accepted
> it with the intention that it should operate as a satisfaction. Both the giving and the
> acceptance in satisfaction are essential elements, and if they be lacking there can be
> no accord and satisfaction. The intention of the parties, which is of course
> controlling, must be determined from all the circumstances attending the transaction.

*Lytle,* 149 Tenn. at 663-64 (quoting 1 Corpus Juris, 529). Matters of intention are generally resolved

by the trier of fact:

> An accord and satisfaction is established by the intentions of the parties at the time
> of the transaction and the issue is a question of fact to be determined by the trier of
> fact. . . . Unless the evidence thereof is insufficient to submit to the jury or is
> undisputed and not open to opposing inferences, accord and satisfaction, including
> the various elements thereof, is ordinarily a question of fact to be determined by the
> jury or by the court where it is the trier of the facts.

*Helms v. Weaver*, 770 S.W.2d 552, 553-54 (Tenn. Ct. App. 1989) (internal citations omitted). That

said, Tennessee courts have often assessed the existence of an agreement as a matter of law:

> Instances may arise in which an acceptance, on the part of the offeree, will be presumed; or where, in the circumstances, the offeree will be held estopped to deny acceptance. Such a case will arise where a check was mailed to a party and cashed, on the face of which appeared, "in full settlement of account."

*Lytle*, 149 Tenn. at 663. *But see Quality Care Nursing Services, Inc. v. Coleman*, 728 S.W.2d 1, 3-4 (Tenn. 1987) (quoting 6 ARTHUR L. CORBIN, CORBIN ON CONTRACTS, § 1277 (1951) for the proposition that: "It is not enough for the debtor merely to write on a voucher or on his check such words as 'in full payment' or 'to balance account' where there has been no such dispute or antecedent discussion as to give reasonable notice to the creditor that the check is being tendered as full satisfaction.").

    2. The Proposed Agreement, If Ratified, Constituted a Valid Accord and Satisfaction.

    A precise parsing of the Tennessee cases regarding what *may* constitute an accord and satisfaction is unnecessary because the Proposed Agreement, if ratified, clearly *would*. The Fugee Defendants' Statement of Undisputed Facts establishes that "prior to the filing of [the] lawsuit, Plaintiffs' representatives and The Fugees' representatives negotiated[] a joint ownership agreement . . . that constituted a final settlement and release of Plaintiffs' claims" and that "the parties agreed to the material terms of [that agreement]." (J.A. 764.) Moreover, the face of the Proposed Agreement, itself entitled "Settlement/Co-Administration Agreement," indicates that its purpose was to "resolve" the dispute between the parties. The agreement provided for joint ownership of "all of the worldwide right, title, and interest in and to the copyright [of 'The Score']." (J.A. 367.) *See*

- 18 -

*Bowater N. Am. Corp. v. Murray Mach., Inc.*, 773 F.2d 71, 76 (6th Cir. 1985) ("The settlement agreement here is clearly an Accord and Satisfaction. The central intent of the agreement was to substitute the undertakings of the agreement for the claims asserted by plaintiff in the original litigation. The settlement agreement clearly embodies those substituted undertakings.").

The central question thus is not whether the Proposed Agreement *could have* operated as an accord and satisfaction. Nor is it whether the combination of Defendants' subsequent conduct (tendering the domestic royalties and reducing their stake in the foreign royalties) and Plaintiffs' subsequent conduct (arguably allowing the domestic funds to be moved, and collecting the foreign royalties) *itself* operated as an accord and satisfaction.[9] Rather, the question is whether through their conduct the parties ratified the Proposed Agreement, *such that* it would operate as an accord and satisfaction. For this inquiry, a more general examination of contract law principles is required. *See* 1 TENN. JURIS., ACCORD AND SATISFACTION § 1 ("An accord and satisfaction is a type of contract and is governed by the law of contracts.") (citing *R.J. Betterton Mgt. Servs., Inc. v. Whittemore*, 733 S.W.2d 880, 882 (Tenn. Ct. App. 1987)); *Cole v. Henderson*, 454 S.W.2d 374, 384 (Tenn. Ct. App. 1969) ("[A]n accord is a form of contract, governed by the general rules for contracts, including the elements of offer and acceptance.")

---

[9]Defendants do not argue, for example, that a brief statement attached to the $400,000 payment operated analogously to the words, "in full settlement of account," mentioned in *Lytle*. *See Lytle*, 149 Tenn. at 663.

## C. "Ratification"

### 1. Offer and Acceptance

"A proposition by one party and an acceptance by the other constitutes an agreement binding on both. No contract is complete without the mutual assent of the parties, and an offer to sell imposes no obligation until it is accepted according to its terms." 1 TENN. JURIS., CONTRACTS § 16. According to the Restatement (Second) of Contracts § 30 (1981):

> (1) An offer may invite or require acceptance to be made by an affirmative answer in words, or by performing or refraining from performing a specified act, or may empower the offeree to make a selection of terms in his acceptance.

> (2) Unless otherwise indicated by the language or the circumstances, an offer invites acceptance in any manner and by any medium reasonable in the circumstances.

### 2. Meeting of the Minds

The Proposed Agreement provided that it "[would] not be binding upon the parties until duly executed by each party" (J.A. 373), and Defendants' concede that the 1998 Settlement was never executed by the parties.[10] Thus Defendants can only uphold the Proposed Agreement as an accord and satisfaction based upon something *outside* of the text of the agreement.

---

[10]"Execute" means "[t]o complete; to sign; to sign, seal, and deliver." BALLENTINES'S LAW DICTIONARY (3d ed. 1969).

The first possibility is that there was a meeting of the minds that Plaintiffs could accept the Proposed Agreement either by exercising dominion over the funds in the Nations' Escrow or by claiming the portion of the foreign royalties that remained after Defendants reduced their claimed share. With respect to the former, it should be noted that nothing in the statement of undisputed facts or the record indicates that Defendants tendered the domestic royalty payments to CMI with the expectation that Plaintiffs, by distributing those funds, would accept the terms of the Proposed Agreement. Defendants insist that but for the Proposed Agreement, they would not have tendered any funds, suggesting that at the time they tendered the funds, they were under the *erroneous* belief that the Proposed Agreement had already been ratified.[11] But if Defendants so believed, then they certainly did not think that Plaintiffs' acceptance of the funds would *ratify* the Proposed Agreement—because they (allegedly) already considered it ratified! Defendants insist that they tendered the funds under the belief that the Proposed Agreement had disposed of Plaintiffs' claims; they thus foreclose the possibility that there was a meeting of the minds that the Proposed Agreement *could be ratified* by Plaintiffs' distribution of the tendered funds.

To illustrate *Plaintiffs'* state of mind regarding the funds in the Nations Escrow, Defendants point to language in paragraph 69 of the complaint: that neither Defendants nor Plaintiffs "[were] entitled to distribute [the Nations Escrow] funds unless and until there exists an executed agreement

---

[11]"Erroneous" because—as Defendants maintain throughout—ratification of the Proposed Agreement occurred only when Plaintiffs' agents authorized the transfer of the funds out of the Nations Escrow or when Plaintiffs collected the foreign royalties.

in writing establishing the rights of the respective parties to the profits of 'The Score.'" (J.A. 29.) The implication, Defendants contend, is that by "distribut[ing]" the funds in the account, the Plaintiffs knew they would *ratify* the Proposed Agreement. But this commits a mistake of logic. Just because Plaintiffs would not be "entitled" to distribute the funds in the absence of a ratified agreement does not mean that they could ratify it by the distribution. In fact, by referring to "an executed agreement *in writing*" (emphasis added), the complaint makes Plaintiffs' state of mind all the more clear: distribution by itself would not execute the agreement.

Many of the same arguments apply to the foreign royalties. The Proposed Agreement did not provide for ratification either by Defendants reducing their share of the foreign royalties or by Plaintiffs collecting what remained after they did. Moreover, the second argument above—that the complaint revealed that Plaintiffs could ratify the agreement by taking certain actions with respect to the Nations Escrow funds—is inapplicable here. The complaint made no mention of the status of the foreign royalties—even to the point of suggesting that Plaintiffs would not be "entitled" to collect the royalties in the absence of an executed agreement—so Defendants cannot argue that it evidenced a meeting of the minds that Plaintiffs could ratify the Proposed Agreement by collecting them.

### 3. Promissory Estoppel

Despite all the talk of "ratification," Defendants' real theory is that the Proposed Agreement became a binding accord and satisfaction by operation of the doctrine of promissory estoppel.[12] In Section I.A of their argument, entitled "The 1998 Settlement Represents An Enforceable Award," Defendants argue that although "[t]he 1998 Settlement was never executed," it is nonetheless binding because "[w]here a party receives the benefit of performance under a contract that lacks a formality of execution . . . that party is estopped to assert the invalidity of the contract." (Appellees' Br. 20.) The cases Defendants cite for this proposition are straight promissory estoppel cases—they concern municipalities that were estopped from asserting the technical invalidity of service contracts whose benefits they had received, rather than private parties who had agreed to the terms of, but never executed, a settlement agreement. In *Trull v. City of Lobelville*, 554 S.W.2d 638 (Tenn. Ct. App. 1976), the court held that after enjoying the benefits of a contract, a city could not avoid its contractual obligations by alleging that the city officials who executed the contract lacked authority to do so. And in *Brown v. City of Manchester*, 722 S.W.2d 394 (Tenn. Ct. App. 1986), the court cited *Trull* in concluding that a city was bound to compensate an official according to the terms of an "Executive Proclamation" that the mayor was allegedly unauthorized to promulgate. *Id*. at 397.

---

[12]Defendants wisely do not contend that a separate implied-in-fact contract—that is, one implied by the conduct of the parties—constituted an accord and satisfaction. They clearly seek to uphold the Proposed Agreement, a written contract, as an accord and satisfaction, and "an implied contract or quasi-contract will not be imposed in circumstances where an express contract or agreement exists." 1 TENN. JURIS., CONTRACTS § 98 (citing *Fletcher Realty, Inc. v. Hayslope Properties*, 712 S.W.2d 478, 481 (Tenn. Ct. App. 1986)).

A case more analogous to this one is *Customized Transp., Inc. v. Bradford*, No. 96-1110, 1997 U.S. App. LEXIS 13847 (6th Cir. June 9, 1997), an unpublished Sixth Circuit case applying Michigan law. In *Bradford*, the court held that promissory estoppel prohibited a defendant from arguing that an oral settlement agreement—pursuant to which the plaintiff waived its right to file an appeal—was invalid under the Statute of Frauds. The defendant there faxed a revised draft of the agreement to the plaintiff's agent, and the agent told the defendant that the draft was "acceptable," thus executing the oral contract. The court noted that in Michigan,

> Promissory estoppel arises in equity when (1) there is a promise (2) that the promisor should have reasonably expected to induce action of a definite and substantial character on the part of the promisee (3) which in fact produces reliance or forbearance of that nature (4) under circumstances such that the promise must be enforced if injustice is to be avoided.

*Id.* at \*12 (citation omitted). The court held that all elements were met, in part because the plaintiff, relying on the agreement, did not file an appeal during the statutory period. The court held the settlement agreement binding in its entirety. *Id*. at \*12-15.

Tennessee's law of promissory estoppel is nearly identical to Michigan's:

> When one man by his promise induces another to change his situation, repudiation of the promise would amount to a fraud. Where [1] one makes a promise [2] which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, and [3] where such promise does in fact induce such action or forbearance, it is binding [4] if injustice can be avoided only by enforcement of the promise.

*Stones River Utils., Inc. v. Metro. Gov't*, 981 S.W.2d 175, 177 (Tenn. Ct. App. 1998) (quoting *Foster & Creighton Co. v. Wilson Contracting Co.*, 579 S.W.2d 422, 427 (Tenn. App. 1979)). If the facts here supported those criteria, the Scipio Plaintiffs should be estopped from denying the validity of the Proposed Agreement, and the district court's grant of summary judgment to the Fugee Defendants should be affirmed. Alas, they do not.

The first problem is that Defendants do not set forth the promise upon which they detrimentally relied. When Defendants speak of their "erroneous" belief that the Proposed Agreement *was* ratified, they suggest that the Proposed Agreement was the relevant promise, *i.e.*, that they relied on that promise when they tendered the domestic royalties and reduced their stake in the foreign royalties. The problem with this is that the Proposed Agreement specified that it would not be binding until duly executed—which it never was—so it could not reasonably have been expected to induce Defendants' reliance. Moreover, that theory would be inconsistent with Defendants' contention that the Proposed Agreement did not become binding until *Plaintiffs* took various actions. As the district court noted, "the Fugee Defendants apparently did not consider [the Nations Escrow] funds to have been accepted by plaintiffs while they were held in escrow"—and thus they did not consider the Proposed Agreement yet ratified.[13] The next possibility, which

---

[13]Defendants likely felt they *had* to take this position. The only reason they were allowed to amend their answer to include the affirmative defense of accord and satisfaction was that they discovered new information nearly five years into the litigation—specifically, that the Nations Escrow funds were missing. Since *the complaint* spoke of Defendants having tendered the funds

appears at page 26 of Defendants' brief and which they articulated at oral argument, is that Defendants tendered the funds relying on a promise that if Plaintiffs were to distribute those funds from the Nations Escrow, Plaintiffs would ratify the Proposed Agreement thereby. But this faces the same difficulties discussed earlier: 1) Defendants tell us that they only learned of the Nations Escrow—and that the Proposed Agreement could be ratified by distribution—upon reading paragraph 69 of the complaint, long after they had tendered the funds; and 2) the complaint did not authorize ratification by distribution.

The second problem is that no injustice would result from refusing to enforce the Proposed Agreement as an accord and satisfaction, because any injury to Defendants could be cured by Defendants amending their answer to plead a counterclaim for unjust enrichment, as opposed to the affirmative defense of accord and satisfaction. Unlike in *Bradford*, where the plaintiff's reliance on the promise resulted in his appeal being procedurally barred, there is nothing here that could not be solved by the Scipio Plaintiffs' repaying to Defendants the funds they have collected: Defendants' alleged reliance has not harmed their defense of the infringement claims they ask the court to bar. Indeed, Defendants did not learn of the alleged ratification of the Proposed Agreement until nearly five years into the litigation. And until that point, they were in no way harmed *by their ignorance* that the Nations Escrow funds had been distributed. Justice may require that the funds be repaid—or

---

in the Nations Escrow, Defendants would have otherwise been barred from asserting five years later that their tendering of those funds ratified the Proposed Agreement.

subtracted from Plaintiffs' damages if they prevail on their infringement claims. But justice does not require that the Proposed Agreement be given effect as an accord and satisfaction of Plaintiffs' underlying claims.

We find that the Scipio Plaintiffs should not be barred by the doctrine of promissory estoppel from asserting the invalidity of the Proposed Agreement. Together with our conclusion that there was no meeting of the minds that the Proposed Agreement could be ratified by any method other than written execution, we find that the Proposed Agreement does not operate to bar the Scipio Plaintiffs' infringement claims.

## D. Equitable Estoppel

Defendants' alternate theory is that Plaintiffs' infringement claims should be barred under the doctrine of *equitable* estoppel, because Plaintiffs "affirmatively, knowingly, and repeatedly accepted the benefits of the 1998 Settlement." As with the Defendants' promissory estoppel theory, equity does not require such a result.

Equitable estoppel is a more general version of promissory estoppel:

> [E]quitable estoppel arises, when one by his acts, representations or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts.

1 TENN. JURIS., ESTOPPEL § 25 (citation omitted). Unlike with promissory estoppel, the party asserting estoppel need not have relied upon a promise by the party to be estopped. But as with promissory estoppel, the touchstone for relief is whether the claimant will be prejudiced unless the opposing party is barred from doing what it otherwise has a right to do. The punishment must match the crime.

As noted, a conversion or unjust enrichment action would remedy Defendants' alleged injury without precluding Plaintiffs' infringement claims. We thus conclude that Plaintiffs need not be equitably estopped from pursuing this action. We do not reach the question—central to an unjust enrichment analysis—of whether equity requires Plaintiffs to refund the moneys they have thus far collected.

## V. Conclusion

We find that the parties have not ratified the Proposed Agreement and that Plaintiffs should not be estopped from denying its validity under the principle of promissory estoppel. We find further that Plaintiffs should not be equitably estopped from pursuing their infringement claims. Accordingly we reverse the district court's grant of summary judgment to Defendants. This renders moot Plaintiffs' appeal of the denial of their Rule 59(e) motion.